Filed 3/25/24  P. v. Kennedy CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JOHN FITZGERALD KENNEDY,<br><br>  Defendant and Appellant. | B324835<br><br>(Los Angeles County<br>Super. Ct. No. NA092421) |

APPEAL from orders of the Superior Court of Los Angeles County.  Laura L. Laesecke, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Spolin Law, Aaron Spolin, Caitlin Dukes, and Jeremy Cutcher for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Scott A. Taryle and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following a jury trial in 2012, Appellant John F. Kennedy was convicted of second degree murder and attempted murder. The jury imposed firearm enhancements under Penal Code section 12022.53 subds. (b)–(d)[1] and a gang enhancement under section 186.22. Upon remand after Kennedy's second appeal, the resentencing court declined to strike Kennedy's firearm enhancements under newly amended section 12022.53 and section 1385 because it found Kennedy would still pose a danger to public safety. The resentencing court also declined to strike Kennedy's gang enhancement under newly amended section 186.22. We conclude that the resentencing court did not abuse its discretion in declining to strike the firearm enhancements. However, we reverse the resentencing court's ruling on the gang enhancement based on the new requirements of section 186.22. We remand to allow the prosecution to retry the gang allegations under newly amended section 186.22.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I.     Underlying offenses[2]

On the night of April 1, 2012, Kennedy's brother, Keyon Kiles, was shot and killed at a strip club on Pacific Coast Highway (PCH) in Harbor City. Kiles and Kennedy were there attending a "going away party" for Charlie Parker, who was

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     We largely take the facts and procedural history leading to this appeal from nonpublished opinions (*People v. Kennedy* (Jan. 26, 2017, B264661 [nonpub. opn.] (*Kennedy I*) and *People v. Kennedy* (Jan. 15, 2020, B264661) [nonpub. opn.] (*Kennedy II*)).

heading to prison.  Parker belonged to the Rolling 20s gang. Kiles and Kennedy were members of the rival Insane Crips gang.

Between eyewitness testimony and surveillance video evidence, there is no dispute that Kennedy pulled out a gun and began firing multiple shots outside the club right after his brother was killed.  The video showed Kennedy just outside the club in a parking lot that separated it from a restaurant, in a firing stance with his arm raised.  The parking lot led out to PCH.  A few hundred feet to the west was a hotel.  Three guests from the strip club party—Ashley Kennedy, Danisha Dixon, and Britney Batiste—fled the shooting and ran down PCH to Dixon's car, which was parked outside the hotel.  The three women heard gunshots as they entered the car.  One round entered the car and struck Batiste in the breast, causing a nonfatal wound.

Ashley Kennedy testified she heard two shots from nearby and believed they came from a car that had pulled up alongside. However, she did not see a car.  Dixon said the shots came from a distance and did not see or hear a car pull up.  Batiste could not tell where the shots came from but said no car had pulled up when the shots were fired.  Batiste had the bullet removed and recovered.  Ashley Kennedy's wrist was cut by broken glass.

Los Angeles police officers investigating the shooting recovered eight .40 caliber Winchester casings from the scene. Based on photos documenting the location of those casings, three were found in the parking area outside the strip club that led out to PCH, with the rest mostly a line heading west on PCH toward the hotel.  They also found a .40 caliber Federal casing on the sidewalk right by the hotel.

About six weeks later, on the night of May 12, 2012, Kenneth McRoyal and Devon Augustine were both attending a

party at a downtown loft complex. McRoyal was shot and killed, and Augustine was shot and wounded at the party. Photographs taken at the party show that Kennedy was there. Three .40 caliber Winchester casings that came from the same gun used in the Harbor City shooting were recovered at the scene—two near the loft and one nearly 400 feet away next to a set of car keys.

Witness testimony and police photos show that the shooting took place near a ground floor wood deck adjacent to a doorway into the loft. A metal gate, covered by a sheer tarp, sat at the far end of the deck. McRoyal and Augustine were outside the deck area when they were shot, and the shots came from behind the tarp. Witness Dwayne W. said he heard arguing near the deck, saw some people shaking hands, then heard one round of gunshots, followed soon after by another round of gunfire.

Between the two shootings, Long Beach police detectives obtained a warrant to add Kennedy's cell phone to an ongoing wiretap of Insane Crips members. In a wiretapped conversation on April 17, 2012, Kennedy talked to an unidentified male about selling or trading his gun. In an April 22, 2012 conversation, Kennedy referred to his brother's feud with Parker, and identified another Rolling 20s gang member as the person who shot and killed Kiles. He also said he was nearby when Kiles was shot and then "pulled out the hammer," "tore the club up," and "just ran out of shells . . . [because] ten . . . [was not] enough." A police gang expert explained that Kennedy's statement that he pulled out a hammer and tore up the club was an admission to committing the shooting.

On May 13, hours after the May 12 loft shooting, a wiretap recorded a conversation where Kennedy asked the other person if he ever found a certain key. The other person said the key had

4

not been found and that the area had been blocked off.  The gang expert believed this referred to the car key that was found near one of the bullet casings.  In a conversation later on May 13, an unidentified male asked Kennedy if he had any "shells for that thing?"  Kennedy replied that he did not because he had used his last night.  The other man asked if he "got off last night," which the gang expert translated as asking whether he had fired his gun.  Kennedy said yes, adding that he got shot in the leg, too.  Asked where this happened, Kennedy answered, "Aw, at some loft function in L.A. somewhere."

During another phone conversation shortly after the loft shooting, Kennedy said he had been shot and was trying to get home.  Asked to describe what happened and who did it, Kennedy replied:  "Nah just, you feel me.  You know how niggas be, it's just like a group of niggas, you know what I'm saying, just get there, they talking, wolfing and shit.  I didn't say shit.  You feel me, I just kept going.  But you know how confrontations go, and niggas end up start shooting."  The other male asked if Kennedy had "knock[ed] back."  Kennedy answered, "Yeah, hell yea." According to the gang expert, "knock back" means to shoot or to shoot back.  During a May 15 wiretapped conversation, Kennedy offered to sell his gun for $500.

In addition to the wiretapped conversations, a variety of physical evidence placed Kennedy at the scene of the two shootings.  As noted, he was identified in a surveillance video as the person taking a firing stance with a gun in his hand in Harbor City.  Kennedy made several phone calls at or near the time of the Harbor City shooting that were relayed through cell phone towers in the club's vicinity.  As part of the wiretap warrant, a GPS device had been attached to Kennedy's car.

It showed that right before the loft shooting, his car was parked near the loft where the car keys and one .40 caliber Winchester casing were found. The car began to drive away moments after the shooting ended.

A detective who went to Kennedy's house on a pretext saw that Kennedy had an in-and-out bullet wound on his left thigh.

## II. Additional relevant gang evidence and prosecutor's closing argument

At trial, the prosecution introduced Long Beach Police Detective Chris Zamora as their gang expert. The prosecution presented Zamora with a hypothetical similar to the facts of the Harbor City strip club shooting. Zamora explained that a gang member and his gang would suffer a loss of reputation if he did not respond to a shooting by a rival gang member. Zamora further testified that a gang member who shoots innocent bystanders creates a more fearsome reputation for the gang beyond that of a gang member who merely kills other gang members. The gang member must escalate the violence and could do so by "spray" shooting, meaning indiscriminately shooting bystanders and targeted victims. By spray shooting, the gang member "instill[s] the maximum amount of violence and injury that you can for both the basic fact [] of shooting, but for notoriety, for the gang context, to show this is the gang that answers back and answers back at a significant level." Zamora further testified that this response helped maintain the gang's control, served to recruit other gang members, and uphold the gang's reputation. Zamora testified that even if the spray shooting was in response to a family member being killed, that it would not change his opinion that it enhances the gang's

reputation. "If you shoot anybody that's a bystander that gets in the way and you still shoot them, that's a reputation."

The prosecution also introduced evidence of two additional predicate offenses to prove a pattern of criminal gang activity under section 186.22. The prosecution submitted minute orders for Tom Love Vinson and Kai Edwards. Zamora testified that a jury convicted Vinson, an active Insane Crips gang member, for murdering a Rolling 20s gang member during an argument on October 30, 2009. Zamora further testified that a jury found the gang enhancement to be true under section 186.22.

As to Edwards, Zamora testified that a jury convicted Edwards, an active Insane Crips gang member, for murdering a rival Rolling 20s gang member on January 29, 2009.

During closing argument, the prosecutor stated:

"You heard the testimony of Detective Zamora of why the defendant or why a person in that situation would just try to spray people. That enhances the reputation, not only of the person shooting, but of the gang itself. Doesn't matter that nobody called out Insane Crips or anything like that. People there knew who was there."

### III.  Sentence and appeals

A jury convicted Kennedy of the second degree murder of McRoyal (count 4) and the attempted murders of Augustine (count 5), Dixon (count 2), Batiste (count 1), and Ashley Kennedy (count 3). (§§ 187, subd. (a), 664.) The jury also convicted Kennedy of shooting at an occupied vehicle (count 6). (§ 245.) The jury found true allegations that he personally and intentionally used a firearm (§ 12022.53, subds. (b)–(d)), that the Harbor City crimes were committed for the benefit of his street gang (§ 186.22), and that Kennedy had served a prior prison term

7

for purposes of the one-year enhancement provided by section 667.5, subdivision (b).  Kennedy was sentenced to a combined state prison sentence of life, plus 173 years and eight months.

We affirmed the judgment of conviction in an opinion filed January 26, 2017.  (*Kennedy I, supra*, B264661.)  The California Supreme Court granted review.  The high court deferred further consideration of the matter pending its decision in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*) addressing the kill zone theory of attempted murder.  After the Supreme Court issued *Canizales*, it transferred the matter to this Court with directions to vacate our original decision and reconsider the cause in light of *Canizales, People v. Perez* (2016) 3 Cal.App.5th 612, 619, and Senate Bill No. 620 (2017–2018 Reg. Sess.) (SB 620; Stats. 2017, ch. 682).  We also granted Kennedy permission to file a supplemental brief addressing Senate Bill No. 136 (2019–2020 Reg. Sess.) (SB 136; Stats. 2019, ch. 590, § 1).

On January 15, 2020, we affirmed the judgment in part. (*Kennedy II, supra*, B264661.)  Relevant to this appeal, we found that "[t]he evidence strongly supported a finding of a direct or specific intent to kill.  As to the Harbor City shooting, the evidence of Kennedy's direct intent is strong, as shown by the trail of expended shell casings leading down PCH toward Batiste, Dixon, and Ashley.  This suggested Kennedy specifically targeted them and came closer in order to increase his chances of hitting his targets, especially as they got into the car, an enclosed space." (*Kennedy II*.)  As such, we found no prejudice under *Canizales*. (*Ibid*.)

We remanded for the trial court to:  (1) exercise its discretion to strike or dismiss the prior serious felony enhancement under SB 620; (2) strike the one-year prior prison

term enhancement attendant to count 1 under SB 136; and (3) conduct a *People v. Franklin* (2016) 63 Cal.4th 261 hearing. (*Kennedy II, supra*, B264661.)

## IV. Resentencing proceedings

On March 2, 2022, the resentencing court, different from the original trial court, struck the one-year prior prison term enhancement under count 1. The resentencing court then continued the proceedings to address the remaining sentencing issues. Kennedy filed a brief arguing that SB 620, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (AB 333), and section 1385 required his firearm and gang enhancements to be stricken.

On July 26, 2022, the resentencing court declined to strike the firearm enhancements under SB 620. The court continued the proceedings to allow for more briefing on whether AB 333 required the court to strike Kennedy's gang enhancement. The court stated its reasoning for not striking the firearm enhancements:

"As far, though, as my exercising my discretion under SB 620, if I look at all of the factors that I need to consider in terms of anytime I impose sentence—and I know I wasn't the person who originally imposed it— but there just aren't—there just aren't any mitigating factors, [appellant], that tell me that it's not appropriate or would justify me exercising that discretion.

"There are two separate shootings. If you saw your brother murdered or you lost siblings, you know the pain that that inflicts on a family. You know it personally. And to have inflicted that on other people two separate times, one was a loss of life, the other very close, where there could have been four other people killed, the law is set at the 25 to life for the gun use for a reason because it has such an impact when people are shot

9

at and potentially going through that horrible life experience of feeling like they're going to die even if they survive it.

"And so I do not disagree with the way that the initial court imposed the gun enhancements, and while I'm happy that you are using your time in some way productively, I don't see it as something that is so impressive that it is telling me that you deserve, quote, unquote, a break.

"I am concerned about the gang involvement, even if the gang enhancement is stricken. Under the new law, the sheer fact that this crime involves gang activity tells me a lot. And, again, it enhances to me the scariness of these two offenses.

"The court is choosing for the protection of society, for deterrence, for punishment of the defendant, for preventing this defendant from committing new crimes, which at this stage he has only been in ten years. I don't know if 30 years from now that might be a different decision. But right now I'm not convinced that he would live a law-abiding lifestyle considering he committed the first time in April and he had time to think about what he had done between April and May, and then he commits another even more serious crime in May.

"So he had that time to reflect upon his behavior and that didn't change his behavior, and I want to protect the public.

"So for those reasons, I'm not going to resentence the defendant on the gun enhancements. [¶] So that portion of the sentence remains."

On August 30, 2022, the court held a hearing on whether to grant relief under AB 333.

The court considered Kennedy's brief arguing that AB 333 required that his gang enhancement must be vacated or struck. Kennedy also argued that section 1385 required that his gang

10

enhancement must be stricken in the interest of justice. Kennedy attached the testimony of the prosecution's gang expert Detective Zamora, some of the jury instructions that the trial court read to the jury, and the prosecutor's closing argument.

The parties agreed that AB 333 applied retroactively to Kennedy because his judgment was not final. The parties further agreed that the gang enhancement only applied to counts 1–3, and 6 that arose from the first shooting at the Harbor City strip club because the second shooting at the loft party was not gang-related.

The court discussed the split in authority over *People v. Clark* (2022) 81 Cal.App.5th 133, reviewed and remanded February 22, 2024, No. S275746 (*Clark*), and *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1073, rehearing denied March 2, 2022, review denied April 27, 2022, disapproved by *People v. Clark* (Feb. 22, 2024, S275746) __Cal.5th__. In *Clark*, the Fourth District held that even under AB 333, individual gang members may commit each predicate offense. In contrast, in *Delgado*, our colleagues in Division Seven of this District held that each predicate offense requires at least two gang members. The court recognized that agreeing with *Delgado* would compel the conclusion that the predicate offenses did not meet the new requirements of AB 333 because Vinson and Edwards committed the crimes individually. The court stated that it agreed with the Fourth District in *Clark*.

The court stated its ruling on the record:

"In this case, and I'm just going to stick to the facts of this case, the predicates established that collectively the gang of Insane Crips choose and kills rivals Rolling 20s, and that's established by the predicates collectively. That was the

11

motivation for both predicates, and that's the motivation to the counts to which the gang allegation applies in this case.

"So collectively that gang is not reputation, although reputation is always a part of it, collectively they are responding to a threat to their gang by being armed and shooting at rivals just like Mr. Kennedy's [half-brother] being killed, Rolling 20s is collectively attacking Insane Crips, so to speak.

"So I think the people have met their burden as to showing that if this case were to be tried today the jury could find beyond a reasonable doubt on the verdicts that this gang—sorry—this crime, counts 1 through 3, were committed in furtherance of gang activity using the same evidence that was presented at the trial originally.

"I don't think I have to deal with 1109, the bifurcation issue. I don't think that applies retroactively. I don't think I have to deal with that.

"So given that, I'm not resentencing the defendant. I will acknowledge on the record that he's 22. I know that.

"I know that Mr. Nguyen asked for him to be resentenced under either 1385 or SB 81. I'm aware of those code sections. In my analysis, I did not know that these crimes were separated by such a different time frame. That, to me, adds to the egregiousness of these crimes because while the first one might have been a reaction to the shooting of his [half-brother], the second one was much more calculated and resulted in the death of the individual.

"And the court at the time of sentencing was aware of the same facts that I would be aware of in terms of the mitigating factor that the defendant's brother or [half-brother] was shot at the same time or right next to him and then that precipitated the

12

counts related to that incident and chose to run the counts concurrent—sorry—consecutive, and just the fact that he is under the age of 26, I am not required to run them concurrent. I have to see if there were any mitigating factors. I don't see any.

"This is not a situation where I can choose between high term, midterm, or low term. Because of the gun use allegations, they're all indeterminate terms.

"So with that said, I'm not going to change the sentence initially pronounced by the judge at the time of sentencing."

The court further noted that Kennedy was "old enough in terms of being a gang member, and he's well-entrenched by 22. [¶] . . . [¶] And I do remember reviewing them and citing to them at the last court date as to one of the reasons that I was not striking the firearm enhancement. [¶] Other than he was taking classes, there wasn't a whole lot that I found to be mitigating at that stage."

Kennedy timely appealed.

## V. Attorney General's request for judicial notice

The Attorney General requests that we take judicial notice of our own record in Kennedy's direct appeal in *Kennedy II*, *supra*, B264661. Kennedy does not oppose the request. We grant the request and take judicial notice of case No. B264661 and the record on appeal because they are records of a court of this state. (See Evid. Code, § 459; Cal. Rules of Court, rule 8.252(a).)

## DISCUSSION

## I. Kennedy's firearm enhancements

Kennedy argues that reversal is required because the resentencing court did not consider mitigating factors when it declined to strike Kennedy's firearm enhancements. We conclude that the resentencing court did not abuse its discretion because it

13

found that striking Kennedy's firearm enhancements would endanger public safety.

### A. Applicable law

Before 2018, sections 12022.5 and 12022.53 prohibited a trial court from striking a firearm enhancement required to be imposed under those sections. (See *People v. Tirado* (2022) 12 Cal.5th 688, 695 (*Tirado*).) The Legislature enacted SB 620 to amend sections 12022.5 and 12022.53, effective January 2018, to give a trial court discretion to strike those enhancements. Sections 12022.5, subdivision (c), and 12022.53, subdivision (h), now provide that a "court may, in the interest of justice [under] Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (See Stats. 2017, ch. 682, § 1; *Tirado,* at pp. 695–696.)

In 2021, the Legislature enacted Senate Bill No. 81 (2021–2022 Reg. Sess.) (SB 81), which amended section 1385 to specify mitigating circumstances that the trial court should consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (Stats. 2021, ch. 721, § 1.)

"Section 1385(c)(2) provides that in determining whether to dismiss an enhancement 'under this subdivision,' the court must consider nine listed mitigating circumstances if proven by the defendant (§ 1385, subd. (c)(2)(A)–(I)), 'unless the court finds that dismissal of the enhancement would endanger public safety' (*id*., subd. (c)(2)). That provision means that if the court finds that dismissal of an enhancement 'would endanger public safety,' then the court need not consider the listed mitigating circumstances." (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 296, rehg. den. Apr. 26, 2023 (*Mendoza*).) "[T]he language of all of the listed

14

mitigating circumstances, applies only if the court does *not* find that dismissal of the enhancement would endanger public safety. That interpretation gives meaning to the language in section 1385(c)(2) requiring the court to consider whether dismissal 'would endanger public safety,' and it consequently avoids rendering that language surplusage." (*Ibid*., original italics.)

We review a lower court's resentencing determination for an abuse of discretion. (*People v. Frazier* (2020) 55 Cal.App.5th 858, 863.) " 'In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, " '[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' " [Citations.] Second, a " 'decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." ' " [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. Strother* (2021) 72 Cal.App.5th 563, 571.)

B.  **The resentencing court did not abuse its discretion when it refused to strike the firearm enhancements**

First, the record does not support Kennedy's contention that the court was not aware of SB 81. The court considered Kennedy's sentencing briefs that extensively discussed SB 81. At the resentencing hearing on Kennedy's gang enhancement,

15

the court confirmed that it was aware of section 1385 and SB 81. Thus, Kennedy's claim on this point is unavailing.

Second, the court stated its reasons for why it thought Kennedy would endanger public safety. The court explained when Kennedy saw his brother murdered, he was aware of the pain that it inflicted and still chose to shoot people on two separate occasions. Even though there was no loss of life at the Harbor City shooting, the court emphasized that being shot at creates a significant impact on people because they fear death. As to the second shooting at the loft party, the court determined that Kennedy had time to reflect on his actions between April and May. Yet, he committed "another even more serious crime in May" by murdering someone.

Because the resentencing court found that Kennedy would endanger public safety, it was not required to consider mitigating factors. (*Mendoza, supra,* 88 Cal.App.5th at p. 296.) Even if it was required to, the resentencing court had Kennedy's sentencing brief setting forth mitigating factors for the court to consider. The court showed that it considered them by finding that "there just aren't any mitigating factors . . . that . . . would justify me exercising that discretion." The court's ruling also shows that it considered that Kennedy's brother was killed in front of him. Nonetheless, the court then concluded that Kennedy's brother's murder did not give him reason to inflict the same violence on others. We disagree with Kennedy's assertion that because the resentencing court did not explicitly reference each potential mitigating factor, the court did not consider those factors. "[T]he general rule is that, faced with a silent record, an appellate court will presume that the trial court performed its duty and acted in the lawful exercise of its jurisdiction." (*People v. Allegheny*

*Casualty Co.* (2007) 41 Cal.4th 704, 715.) In any event, there is nothing in the record to support Kennedy's argument that the resentencing court misapplied the law. The resentencing court explained its rationale for why Kennedy continued to pose a danger to public safety. Kennedy does not argue and we find no authority that holds "that dismissal is required even when it would endanger public safety." (*Mendoza, supra,* 88 Cal.App.5th 287 at p. 297.) In fact, "every version of the statute—including . . . the current one—expressly empowered the court to impose the enhancement upon a finding that dismissing it would endanger public safety." (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 19, rehg. den. Mar. 22, 2023.) Accordingly, the court did not abuse its discretion.

While a different court may have reached another result in this case, the resentencing court's conclusion was not " ' "arbitrary, capricious or patently absurd." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 378.) Nor was its conclusion completely unsupported by the record, such that it amounted to a reversible abuse of discretion. (*Id.* at p. 379.)

## II. Kennedy's gang enhancement

Kennedy argues that the court was required to strike his gang enhancement under SB 81 for the same reasons it was required to strike the firearm enhancements. We decline to strike the gang enhancement under SB 81 for the same reasons we decline to strike the firearm enhancements. However, we reverse the resentencing court based on the new requirements of AB 333.

### A. Statutory framework and AB 333

Section 186.22 provides for a gang enhancement when a defendant is convicted of an enumerated felony committed "for

17

the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Prior to the amendments made by AB 333, a " 'criminal street gang' " was defined as "an ongoing organization, association, or group of three or more persons, whether formal or informal, within an established hierarchy, having as one of its primary activities the commission of one or more of the [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) A " 'pattern of criminal gang activity' " was defined as "the commission of . . . two or more of the [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years after a prior offense, the offenses were committed on separate occasions or by two or more persons." (Former § 186.22, subd. (e).)

Effective January 1, 2022, AB 333 modified the definition of a " 'criminal street gang' " to "an *ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.) Thus, AB 333 no longer allows for gang members to individually engage in a pattern of criminal gang activity under the predicate offenses.

18

AB 333 also redefined " 'pattern of criminal gang activity' " to mean "the commission of . . . two or more of the [enumerated criminal acts], provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, *the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational.*"  (§ 186.22, subd. (e)(1), italics added.)

Under the new legislation, "imposition of a gang enhancement [now] requires proof of the following additional requirements with respect to predicate offenses:  (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345*,* quoting § 186.22, subds. (e)(1)–(2).)

The new legislation further adds:  "[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)

19

### B. Kennedy is entitled to the ameliorative benefits of AB 333

During the resentencing proceedings, the parties agreed with the resentencing court that Kennedy was entitled to the retroactive benefits of AB 333. On appeal, the Attorney General notes that AB 333 was not within the scope of our remand order from the prior appeal and thus Kennedy's judgment was final when AB 333 went into effect. Because the question presents a pure question of law based on undisputed facts, we exercise our discretion to consider it for the first time on appeal. (See *In re Stier* (2007) 152 Cal.App.4th 63, 75–76.) We hold that AB 333 applies retroactively to Kennedy.

The parties do not dispute our Supreme Court's holding that the changes AB 333 made to the elements of section 186.22 apply retroactively to any criminal matter that is not yet final on appeal. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207 (*Tran*).) However, there is a split in authority on whether a defendant is entitled to retroactive application of AB 333 where he appeals for a second time after his judgment was conditionally reversed and the Court of Appeal issued a limited remand to the trial court to address sentencing issues.

In *People v. Lopez* (2023) 93 Cal.App.5th 1110, review granted November 15, 2023, S281488 (*Lopez*), the majority held that the defendant was entitled to the ameliorative benefits of AB 333 when his matter was remanded to the trial court to strike specific enhancements. (*Id.* at p. 1119.) Nonetheless, the majority held that those benefits were "irrelevant" because the matter had been remanded solely for resentencing, thus the trial court had no jurisdiction to relitigate the gang enhancements.

20

(*Id.* at pp. 1114, 1119.)  For this reason, the majority declined to extend AB 333's benefits to the defendant.  (*Ibid.*)

In *People v. Mitchell* (2023) 97 Cal.App.5th 1127*,* review granted February 21, 2024, S283474 (*Mitchell*), our colleagues in the Fifth District disagreed with *Lopez.*  (*Mitchell*, at p. 245.)  The Fifth District noted that our Supreme Court has held that "[a] judgment and sentence are generally considered synonymous, and there is no judgment of conviction without a sentence."  (*Id.* at p. 241.)  The Fifth District concluded that "[a]lthough the trial court in *Lopez* (like the lower court in this matter) may have been bound by the scope of the prior remittitur, the retroactive benefits should have been extended to the defendant on appeal because his criminal proceeding had not yet been reduced to a final judgment."  (*Id.* at p. 245.)

We find *Mitchell* more persuasive.  Applying the reasoning in *Mitchell*, Kennedy's "criminal prosecution had not concluded before the ameliorative legislation took effect.  [Kennedy] was still waiting for his 2022 resentencing to occur when this new law became operative on January 1, 2022."  (*Mitchell, supra,* 97 Cal.App.5th at p. 243.)  Thus, Kennedy's "criminal judgment never became final, and we must presume the Legislature intended for this ameliorative enactment to apply as broadly as is constitutionally permissible."  (*Ibid.*)  Accordingly, Kennedy is entitled to the benefits of AB 333 on appeal.  (*Ibid.*)

C.     **AB 333 requires us to vacate Kennedy's gang enhancement**

The jury was presented with the prior version of section 186.22 that did not include the new elements of the amended law.  As relevant here, AB 333 now requires that the predicate and underlying offenses provide more than a reputational benefit to

21

the gang.  (§ 186.22, subds. (e)(1), (g), as amended January 1, 2022.)  "When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error."  (*Tran*, *supra*, 13 Cal.5th 1169 at p. 1207, quoting *People v. Flood* (1998) 18 Cal.4th 470, 504.)

The jury's true findings on the gang enhancement allegations on each count must be vacated because we cannot conclude beyond a reasonable doubt that the verdict would have been the same if the jury was instructed under the new law. (*Tran*, *supra*, 13 Cal.5th at p. 1207.)  In particular, "the prosecution's evidence and argument focused on reputational benefit to the gang, which is . . . no longer permitted under amended section 186.22."  (*People v. E.H.* (2022) 75 Cal.App.5th 467, 479.)

The Attorney General argues that any error was harmless because there was overwhelming evidence that the common benefit to the Insane Crips was more than reputational as there was evidence that Kennedy retaliated or targeted a perceived or actual gang rival.  We disagree.

*People v. Sek* (2022) 74 Cal.App.5th 657 (*Sek*) is instructive. In that case, the prosecution's expert testified about several ways in which a crime could benefit a criminal street gang, including enhancing reputation.  (*Id*. at p. 669.)  The Attorney General in that case argued that any error was harmless because the prosecution's gang expert also testified that "gang members may commit crimes to retaliate against rival gangs, to defend and to

22

try to expand their territory." (*Id*. at p. 668.) As in this case, the prosecution's expert testified that a hypothetical crime similar to the charged offense could "enhance the reputation" of a gang. "[I]n closing arguments, the prosecutor argued that Sek's crime benefits the gang because '[t]hey want you to know who they are.' " Our colleagues in Division One of this District held that "[a]lthough there was a great deal of evidence of benefits to the gang that went beyond reputational, we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true. Thus, the instructional error on this question was not harmless . . . ." (*Id*. at p. 669.)

Here, the case for reversal is even stronger. The prosecution's expert testimony overwhelmingly focused on Kennedy's actions being a benefit to the Insane Crips's reputation. Additionally, in Kennedy's prior appeal, we found that substantial evidence supported a finding that "Kennedy's direct intent is strong, as shown by the trail of expended shell casings leading down PCH toward Batiste, Dixon, and Ashley Kennedy. This suggested Kennedy specifically targeted them and came closer in order to increase his chances of hitting his targets, especially as they got into the car, an enclosed space." (*Kennedy II*, *supra*, B264661.) Batiste, Dixon, and Ashley Kennedy were neither actual nor perceived gang members. Further, like in *Sek*, the prosecutor's closing argument focused on Kennedy committing the crime because it enhanced his or the gang's reputation. Thus, "the basis of the jury's verdict is not so clear[,]" and the instructional error was not harmless. (*Sek*, *supra*, 74 Cal.App.5th at p. 669.)

23

In dispute in this case is the narrow question of whether collective engagement under amended section 186.22, subdivision (f), requires that the predicate offenses must have each been "committed by more than one person," rather than "individually but on a different day." (*Delgado, supra,* 74 Cal.App.5th at pp. 1088–1089; accord, *People v. Lopez, supra*, 73 Cal.App.5th at p. 345.) As we noted, the resentencing court followed the Fourth District's holding in *Clark* that under amended section 186.22, subdivision (f), the predicate offenses may be committed by an individual gang member rather than two or more gang members. (*Clark, supra*, 81 Cal.App.5th at pp. 145–146.) Our Supreme Court recently clarified that "[b]y contrasting offenses committed on 'separate occasions' with those committed by 'two or more members,' the language of section 186.22(e)(1) indicates that only the second alternative requires the participation of more than one gang member. This is the most straightforward reading of the language of the statute." (*People v. Clark, supra*, __Cal.5th__ [p. 13].) Thus, the Supreme Court disapproved of *Delgado* and agreed with the Fourth District in *Clark* on this point. Accordingly, the resentencing court correctly held that the predicate offenses may be committed by individual gang members.

However, the jury was not asked whether any of the predicate offenses provided a common benefit to the gang that was more than reputational, as required under amended section 186.22, subdivision (e)(1). While Zamora testified that both Vinson and Edwards targeted rival Rolling 20s gang members, Zamora's expert testimony on Kennedy's charged offense also suggested that the predicate offenses could produce reputational benefits. "To rule that the existence of evidence in the record

24

that would permit a jury to make a particular finding means that the jury need not actually be asked to make that finding would usurp the jury's role and violate [Kennedy's] right to a jury trial on all the elements of the charged allegations." (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.) On this record we cannot say beyond a reasonable doubt (see *Tran*, *supra*, 13 Cal.5th at p. 1207) that the jury would have found at least two predicate offenses provided a qualifying common benefit.

Accordingly, we vacate the gang enhancement findings and remand so that the prosecution may retry the gang enhancement based on the new requirements of AB 333. (*People v. Clark*, *supra*, __Cal.5th__ [p. 30].)

## DISPOSITION

The resentencing court's order declining to strike Kennedy's firearm enhancements is affirmed. The resentencing court's order declining to strike Kennedy's gang enhancement is reversed. The jury's true findings that Kennedy committed the offenses for the benefit of a criminal street gang are vacated. The cause is remanded to provide the People an opportunity to retry the criminal street gang enhancement under newly amended section 186.22.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

GRIMES, J.

25